McELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
One Hovchild Plaza
4000 Route 66
Tinton Falls, New Jersey 07753
(732) 733-6200
Attorneys for Plaintiff,
Principal Life Insurance Company

| | |
|---|---|
| **PRINCIPAL LIFE INSURANCE COMPANY,**<br><br>Plaintiff,<br><br>v.<br><br>**DALBERT GRAHAM,**<br><br>Defendant. | UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK<br><br>CIVIL ACTION NO.: |

**CIVIL ACTION – COMPLAINT ON BEHALF OF
PRINCIPAL LIFE INSURANCE COMPANY**

Principal Life Insurance Company ("Principal Life"), by and through its attorneys, McElroy, Deutsch, Mulvaney & Carpenter, LLP, by way of Complaint against the defendant Dalbert Graham ("Graham") alleges and says:

**INTRODUCTION**

1. At all relevant times, Principal Life is an insurance company organized and existing under the laws of the State of Iowa, with its principal place of business located at 711 High Street, Des Moines, Iowa 50392-0410.

2. Principal Life brings this action against Graham to have a policy of disability income insurance issued to Graham declared null and void and rescinded, *ab initio*, because

Graham knowingly and intentionally made material misstatements and omissions in executing the application forms.

## PARTIES

3. Principal Life is, and during all times relevant has been, in the business of underwriting policies of disability income insurance and is authorized to transact the business of insurance in the State of New York.

4. Graham is a resident of the State of New York, maintaining a primary residence and domicile located at 146 177th Street, Jamaica, Queens, New York, 11434.

## JURISDICTION AND VENUE

5. This Court possesses subject matter jurisdiction based upon diversity of citizenship of the within parties pursuant to 28 U.S.C. § 1332.

6. Principal Life is a citizen of the State of Iowa within the meaning and intent of 28 U.S.C. § 1332.

7. Graham is a citizen of the State of New York within the meaning and intent of 28 U.S.C. § 1332.

8. There is complete diversity of citizenship between the parties to this action pursuant to 28 U.S.C. § 1332 and the amount in controversy exceeds $75,000.00, exclusive of interest and costs of suit.

9. Venue in the United States District Court for the Eastern District of New York is proper, because the acts giving rise to the controversy took place in New York within the meaning and intent of 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**Application For and Issuance of the Policy of Disability Income Insurance**

10. On April 15, 2015, Graham completed and executed an application, Parts A and C, seeking the issuance of a policy of disability income insurance bearing policy no. 7869202 (the "Disability Policy"). On April 23, 2015, Graham completed the Teleapp Application, Part B seeking the issuance of the Disability Policy. On June 7, 2015, Graham completed and executed the Amendment and Acceptance form and Part D of the application seeking the issuance of the Disability Policy (the application Parts A, B, C and D and Amendment and Acceptance Form are hereinafter collectively referred to as the "Application"). The Application is fully incorporated by reference as if same were set forth at length herein.

11. In executing the Application, Graham knew that he was required to provide complete, truthful, accurate and honest answers to the questions present on the Application, including medical history, physical condition, diagnosis, prognosis, and treatment.

12. In executing the Application, Graham knew that Principal Life would rely upon the answers recorded thereon in determining whether Graham was insurable and otherwise qualified for the policy of disability income insurance applied for by Graham.

13. In executing the Application, Graham knew that he may be subject to civil and criminal penalties in the event he knowingly made any false or misleading statements in order to obtain the policy of disability income insurance.

14. In executing Part A of the Application, Graham applied for a maximum disability income benefit of $2,000 monthly, following a 90-day elimination period, with a benefit period and Your Occupation period of five years. Graham also applied for a Future Benefit Increase benefit.

15. On April 15, 2015, Graham completed and executed Part C of the Application, thereby specifically agreeing as follows:

**AGREEMENT:**
**Statements in Application(s):** I represent that all statements in this application(s) are true and complete to the best of my knowledge and belief and were correctly recorded before I signed my name below. I understand and agree that the statements in this application(s), including all of its parts, and statements by the Proposed Insured in any medical questionnaire(s) that becomes a part of this application(s), will be the basis of any insurance issued. I understand that material misrepresentations could mean denial of an otherwise valid claim and rescission of the policy during the contestable period.

**When Coverage Becomes Effective:** I understand and agree that the Company shall incur no liability until (1) a policy issued on this application(s) has been received and accepted by the owner and the first premium paid; and (2) at the time of such delivery and payment, the person to be insured is actually in the state of health and insurability represented in this application(s), medical questionnaire(s), or amendment(s) that becomes a part of this application(s); and (3) the Part D of the Application or the Delivery Receipt form, and any required Amendment and Acceptance or other forms are signed by me and the Proposed Insured (if different) and dated at delivery. If these conditions are met, the policy is deemed effective on the Policy Date stated in the policy. If the application was submitted COD (cash on delivery) or a request for a change in the Policy date is received, the Policy Date may be changed to the date coverage becomes effective and a new Data Page will be sent to the Owner.

**Limitation of Authority:** I understand and agree that no licensed agent, broker, representative, telephone interviewer, or medical examiner has any authority to determine insurability, or to make, change, or discharge any contract, or to waive any of the Company's rights. The Company's right to truthful and complete answers to all questions on this application(s) and any medical questionnaire(s) that becomes part of this application(s) may not be waived. Subject to the Time Limit on Certain Defenses provision in the policy, no knowledge of any fact on the part of any licensed agent, broker, representative, telephone interviewer, medical examiner, or other person shall be considered knowledge of the Company unless such fact is stated in the application(s).

\* \* \*

**Pre-Existing Condition Limitation:** The policy being applied for does not cover Disability or loss which begins within two years after the effective date of coverage(s) and results from a pre-existing condition which occurred within the two year period prior to the effective date of coverage(s) and was not disclosed or was misrepresented in this application.

4

Any person who knowingly and with intent to defraud any insurance company or other persons files an application for insurance or statement of claim containing any material false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

16. On April 23, 2015, Graham completed the TeleApp application, Part B seeking issuance of the Disability Policy.

17. In completing the Part B, Graham represented in response to Question 7 that his primary occupation was "Steam Fitter," and his employer was "WDF."

18. In completing Part B of the Application seeking the issuance of the Disability Policy, Graham was asked the following questions and provided the following responses:

13. Are you actively at work on a full-time basis without medical restriction? (If no, explain below) ……..**Yes**

14. Do you intend to change jobs or employment in the next 6 months? (If yes, explain below)… ……...**No**

15. Have you ever requested or received any type of disability benefits (including worker's compensation and state disability) for any injury or illness? (If yes, please explain below) ………………………….**No**

\* \* \*

18. In the last ten years, have you had, been treated for or been diagnosed as having:

\* \* \*

    i. back or neck pain, disc problems, spinal sprain or strain, sciatica, arthritis, carpal tunnel syndrome, or any other disease or disorder of the bones, joints, or muscles? …………………………….**No**

\* \* \*

22. In the last ten years:

5

    a.    have you had any medical tests (other than HIV test), hospitalization, illness or injury not provided in response to previous question? (If yes, explain below) …**Yes**

    b.    have you consulted a doctor, chiropractor, psychiatrist, psychologist, counselor, therapist or other healthcare provider not provided in response to a previous question? (If yes, explain below) …………………………..**No**

23.    Are you taking or have you been advised to take any medication or treatment not provided in response to a previous question? (If yes, explain below) ……………..**No**

19.    In response to Question 21, Graham represented that his primary physician was "Randhar Bajaj (IM)," who he last seen in February, 2015, for a cold.

20.    Having answered "Yes" to Question 22a, Graham represented in the details section of the Application that he had routine blood and urine tests in April, 2015, for an insurance policy, with all testing normal. Graham represented that, "client stated he received a preferred status rating for the insurance policy."

21.    On June 7, 2015, Graham executed the Amendment and Acceptance form seeking the issuance of the Disability Policy.

22.    Through and by virtue of the execution of the Amendment and Acceptance form, Graham expressly acknowledged and agreed:

> Any amendments to the Application listed above are part of the Application, and the Application and the amendments are to be taken as a whole. It is agreed that the above Policy is issued (or adjusted or reinstated, as applicable) on the basis of the statements in the Application and in this Amendment and Acceptance Form.
> 
> o  I have reviewed the Application (including any medical questionnaire) and this Amendment and Acceptance form.
> o  To the best of my knowledge and belief, all statements in the Application, as amended, are true and complete as of the date I am signing this Amendment and Acceptance form.
> o  Since the date the Application was signed, there has been no change in the Insured's health or any other information in the

6

Application, except as specifically stated on this Amendment and Acceptance form.

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any act material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

23. On June 7, 2015, Graham executed the Part D application seeking the issuance of the Disability Policy.

24. Through and by virtue of the execution of the Part D Application, Graham expressly acknowledged and agreed:

**Statements in Application:** I have read all the questions and answers obtained during the telephone application interview. This includes Part B on the Proposed Insured. I represent that all statements are true and complete to the best of my knowledge and belief and were correctly recorded before I signed my name below. I have also signed a copy of this Agreement/Acknowledgement of Delivery included with my policy. I understand and agree that the statements in the application, including all of its parts, and statements by the Proposed Insured in any medical questionnaire(s) that becomes a part of this application, will be the basis for and form a part of the policy. I understand that material misrepresentations could mean denial of an otherwise valid claim and rescission of the policy during the contestable period.

**When Coverage Becomes Effective:** I understand and agree that the Company shall incur no liability until (1) a policy issued on this application has been received and accepted by the owner and the first premium paid; and (2) at the time of such delivery and payment, the person to be insured is actually in the state of health and insurability represented in the application(s), medical questionnaire(s), or amendment(s) that becomes a part of the application; and (3) that Part D of the Application or the Delivery Receipt form and any other required Amendment and Acceptance or other forms are signed by me and the Proposed Insured (if different) and dated at delivery. If these conditions are met, the policy will then be deemed effective on the Policy Date stated in the policy. If the application was submitted COD (cash on delivery) or a request for a change in the Policy Date is received, the Policy Date may be changed to the date coverage becomes effective and a new Data Page will be sent to the Owner.

* * *

**Insurability Dates:**

If a premium deposit or another form acceptable to the Company was submitted with Part A and C of the application. I verify to the best of my knowledge and belief that the information in Part B of the application truly reflects the Proposed Insured's health or insurability as of <u>04/23/2015</u>, the date the telephone application interview was completed. I further verify to the best of my knowledge and belief that the answers in Part A and B of the application and true and correct as of the date hereof, and there has been no change in the Proposed Insured's health or insurability as of the date I sign Part D of this application. No change in insurability will be taken into consideration after the Start Date as defined in the Conditional Receipt.

If the application was submitted on a C.O.D. (Cash on Delivery-no premium deposit) basis, I verify to the best of my knowledge and belief that the information in Part A and B of the application truly reflects the Proposed Insured's health or insurability as of the date I sign Part D of this application.

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the state value of the claim for such violation.

25. Based on Graham's statements and representations contained in the Application, and relying upon Graham's complete answers, candor, honesty and openness in disclosing relevant information on the Application, Principal Life issued Graham a policy of disability income insurance bearing Policy No. 7869202. The Policy provides a monthly benefit of $1,410.00 for the first 90 days of total disability and $2,000.00 from the 91st day to the Maximum Benefit Period.

26. The Disability Policy was delivered to Graham on June 7, 2015, at which time coverage became effective to coincide with the last contractual delivery requirement.

27. The Disability Policy and the section entitled **The Contract** provides:

**ENTIRE CONTRACT**
The policy, the attached applications, and any attached riders or endorsements make up the entire contract.

**TIME LIMIT ON CERTAIN DEFENSES**
In issuing the coverage(s) under this policy and any attached riders, We have relied on the statements and representations on the application. We have the right to void the coverage(s) due to a material misstatement or omission in the application. However, after two years from the effective date of coverage(s), no material misstatements or omissions, except fraudulent statements or omissions, made by You or the Owner in an application will be used to void the coverage(s) or deny a claim for Disability which starts after the expiration of such two-year period.

\* \* \*

**FRAUD**
Upon a judicial decision in a civil or criminal court that You and/or the Owner have committed fraud in obtaining this policy or the filing of a claim under this policy, We may void this policy.

**Principal Life's Investigation of Graham's Disability Claim**

28. On October 19, 2015, Graham executed the Disability Claim Notice representing that he became totally disabled on June 17, 2015 (10 days after the Policy Date) from an injury to his shoulder which occurred on June 4, 2015 (prior to the Policy Date). In the Disability Claim Notice, Graham described his occupation as a Steam Fitter, his employer being "WDF, Inc." and that he filed a workers' compensation claim. Graham left unanswered the question in the Disability Claim Notice which asked, "please provide the names of any healthcare providers and hospitals you were treated at in the past five years."

29. During the course of Principal Life's review and investigation of Graham's disability claim, Principal Life discovered, for the first time, that the representations and statements made by Graham on the Application were materially false, that Graham knowingly failed and omitted to disclose material facts; and otherwise knowingly failed to accurately, honestly and/or truthfully answer and disclose material information in response to the questions

9

present on the Application which, if disclosed, Principal Life would have declined to issue the Disability Policy to him.

30. Specifically, and by way of illustration only, Graham knowingly and intentionally made material misstatements of fact, failed, refused and omitted to disclose material facts, and otherwise failed to correctly answer and disclose the following:

- On September 11, 2014, Graham consulted Dr. Richard D'Agostino for left shoulder pain which had been present for three months. Graham complained of throbbing pain causing sleep disturbances, and pain with overhead activities. Dr. D'Agostino formed the impression of left shoulder pain, rule out rotator cuff tear, recommended an MRI scan and discussed various surgical and conservative treatment options.

- An MRI of the left shoulder was performed on September 17, 2014, which was interpreted as "distal supraspinatus and infraspinatus, tendonopathy without focal tear, mid AC joint arthrosis and bone spurs arising from the medial aspect of the bicipital groove without biceps tear or dislocation.

- Graham consulted Dr. D'Agostino on November 19, 2014, for follow up of the left shoulder pain. It was noted that Graham had no relief using anti-inflammatory medication and treatment options were again discussed including continued use of anti-inflammatory medication, cortisone injection, surgical intervention, and other alternative options. Physical examination performed on November 19, 2014, demonstrated that Graham continued to have complaints of pain and weakness with overhead activities, putting on a coat, sleeping on his side, washing, and performing sports overhead. Dr. D'Agostino provided a diagnosis of left shoulder rotator cuff tendonitis.

- On March 4, 2015, Graham consulted Dr. D'Agostino for follow up of his left rotator cuff tendonitis. Graham stated he received no relief from conservative treatment. Dr. D'Agostino noted that "we discussed at length the pathology of tendonitis and tenosynovitis, the possible irritation, trauma, repetitive use, or chronic strain etiologies. The benefit of improvement with ice massage, regular stretching, anti-inflammatory medication is discussed, understanding the possible need for outpatient therapy with modalities. Other options are discussed including use of anti-inflammatory medication by mouth versus cortisone injection at this point. The patient was prescribed a prescription for physical therapy."

- Graham received physical therapy at Flowers Physical Therapy for treatment of the rotator cuff tendonitis, left shoulder, beginning March 11, 2015, through May 11, 2015.

- Flowers Physical Therapy issued correspondence dated April 11, 2015 (four days prior to the execution of Part C, which indicates, "not able to lift heavy supplies at work (steam fitter)." The letter indicates that Graham will be treated three times a week for four weeks then reevaluated.

- On May 11, 2015, in a letter to Dr. D'Agostino from Flowers Physical Therapy, it is indicated that Graham is complaining of increased pain in the left shoulder in the past week and relates the pain to heavy lifting. In the said correspondence, it is stated that Graham will be treated three times a week and then reevaluated.

- During the time period Principal Life was underwriting the Disability Policy, Graham was receiving physical therapy for pain and restricted motion in the left shoulder and, in fact, received physical therapy on April 13, April 15, 2015 (the day he signed Part C) and many days that followed.

- Prior to the issuance and delivery of the Disability Policy, Graham claims to have sustained an injury on June 4, 2015, to his left shoulder, and was unable to work thereafter, and/or returned to work with limited use of his left arm.

- In the fall of 2014, Graham came under the care of Dr. Peter Stein for pain in his right middle finger. Dr. Stein diagnosed Graham with trigger finger, and injected the finger on two occasions.

31. By correspondence dated May 31, 2016, Principal Life advised Graham that it formally declared the rescission, *ab initio*, of the policy of disability income insurance bearing Policy No. 7869202 and issued a check in the amount of $1,859.13, representing the return of all premiums theretofore paid plus interest.

32. In response to Principal Life's correspondence dated May 31, 2016, Graham negotiated and cashed the premium refund check, however, did not execute the Rescission Agreement.

11

## FIRST COUNT

33. Principal Life repeats and realleges the allegations contained in paragraphs 1 through 32 inclusive, as if the same were fully set forth at length herein.

34. As is set forth more fully in the preceding paragraphs, Graham knowingly and intentionally misrepresented, concealed, and/or failed to disclose his complete medical history, his consultations with physicians, the diagnostic tests he underwent, the medical treatment he was advised to have and did have, and the medication he had been or currently was taking when he completed the Application seeking the issuance of the Disability Policy.

35. As is set forth more fully in the preceding paragraphs, Graham knowingly and intentionally made material misstatements of fact in response to the questions present on the Application, and otherwise failed, refused and/or omitted to disclose material facts, all of which is aforesaid.

36. Graham made false material representations of presently existing or past facts when he completed the Application seeking the issuance of the Disability Policy with the intent that they be relied upon.

37. Principal Life relied on the false material representations of Graham and issued the Disability Policy bearing policy no. 7869202.

38. Principal Life has no adequate remedy at law and therefore seeks that the Disability Policy bearing policy no. 7869202 be declared null and void and rescinded, *ab initio*.

**WHEREFORE**, Principal Life demands judgment against Graham for relief more particularly described as follows:

(a)   An order declaring and adjudging the policy of disability income insurance policy no. 7869202 to be null and void and rescinded, *ab initio*; and

(b)   An order awarding prejudgment interest, post judgment interest, costs of suit, reasonable attorney fees and such other relief the court deems equitable and just.

## SECOND COUNT

39.   Principal Life repeats and realleges the allegations contained in paragraphs 1 through 38 inclusive, as if the same were fully set forth at length herein.

40.   Graham knowingly, negligently and/or innocently made material misstatements of fact; failed to disclose material facts in response to the questions presented on the Application; and otherwise failed, refused and/or omitted to disclose material facts, all of which as aforesaid.

41.   Principal Life has no adequate remedy at law, and therefore seeks that the Disability Policy be declared null and void and rescinded, *ab initio.*

**WHEREFORE**, Principal Life demands judgment against Graham for relief more particularly described as follows:

(a)   an order declaring and adjudging the Disability Policy bearing policy no. 7869202 to be null and void and rescinded, *ab initio*; and

(b)   an order awarding pre-judgment interest, post-judgment interest, costs of suit, reasonable attorney fees and such other relief the Court deems equitable and just.

## THIRD COUNT

42.   Principal Life repeats and realleges the allegations contained in paragraphs 1 through 41 inclusive, as if the same were fully set forth at length herein.

43.   Principal Life issued the Disability Policy pursuant to, and in accordance with, a mistake of fact, all of which as aforesaid.

44. Principal Life has no adequate remedy at law, and therefore seeks that the Disability Policy be declared null and void and rescinded, *ab initio.*

**WHEREFORE**, Principal Life demands judgment against Graham for relief more particularly described as follows:

(a) an order declaring and adjudging the Disability Policy bearing policy no. 7869202 to be null and void and rescinded, *ab initio*; and

(b) an order awarding pre-judgment interest, post-judgment interest, costs of suit, reasonable attorney fees and such other relief the Court deems equitable and just.

## FOURTH COUNT

45. Principal Life repeats and realleges the allegations contained in paragraphs 1 through 44 inclusive, as if the same were fully set forth at length herein.

46. Annexed to the Disability Policy was Part C of the Application executed by Graham on April 15, 2015, which provides, in material part:

> **When Coverage Becomes Effective:** I understand and agree that the Company shall incur no liability until (1) a policy issued on this application(s) has been received and accepted by the owner and the first premium paid; and (2) at the time of such delivery and payment, the person to be insured is actually in the state of health and insurability represented in this application(s), medical questionnaire(s), or amendment(s) that becomes a part of this application(s); and (3) the Part D of the Application or the Delivery Receipt form, and any required Amendment and Acceptance or other forms are signed by me and the Proposed Insured (if different) and dated at delivery. If these conditions are met, the policy is deemed effective on the Policy Date stated in the policy. If the application was submitted COD (cash on delivery) or a request for a change in the Policy date is received, the Policy Date may be changed to the date coverage becomes effective and a new Data Page will be sent to the Owner.

47. The section of the Disability Policy entitled THE CONTRACT provides:

ENTIRE CONTRACT. The policy, the attached applications, and any attached riders or endorsements make up the entire contract.

48. On the date the Disability Policy was delivered and accepted and the first premium paid, Graham was not in the state of health and insurability represented in the Applications.

49. Graham failed to satisfy the conditions precedent for coverage to be effective under the Disability Policy.

50. Principal Life has no adequate remedy at law, and therefore seeks that the terms and provisions of the Disability Policy pertaining to the conditions precedent to the effectiveness of coverage be specifically enforced.

**WHEREFORE**, Principal Life demands judgment against Graham for relief more particularly described as follows:

(a) an order specifically enforcing the conditions precedent to the effectiveness of coverage under and pursuant to the Disability Policy bearing policy no. 7869202; and

(b) an order declaring and adjudging that the Disability Policy bearing policy no. 7869202 was and is not effective, and null and void and of no force and effect; and

(c) an order awarding pre-judgment interest, post-judgment interest, costs of suit, reasonable attorney fees and such other relief as the Court deems equitable and just.

## FIFTH COUNT

51. Principal Life repeats and realleges the allegations contained in paragraphs 1 through 50 inclusive, as if the same were fully set forth at length herein.

52. Graham was at all times relevant to the execution and submission of the Application seeking the issuance of the Disability Policy under a duty of honesty, good faith and fair dealing to immediately and forthwith advise Principal Life of any material change in

Graham's insurability from that represented in the Application which may occur any time prior to the issuance, delivery and acceptance of the Disability Policy and payment of the first premium.

53. Graham intentionally, willfully, and/or negligently failed, refused and/or neglected to disclose, inform or otherwise advise Principal Life that Graham's insurability materially changed from that represented on the Application prior to the issuance, delivery and acceptance of the Disability Policy and payment of the first premium.

54. Had Graham not intentionally, willfully, and/or negligently failed, refused and/or neglected to disclose, inform or otherwise advise Principal Life that Graham's insurability materially changed to obtain the Disability Policy, he would not have been able to obtain the Disability Policy.

55. As a direct and proximate result of Graham's breach of the duties of honesty, good faith and fair dealing, Principal Life issued the Disability Policy and has otherwise sustained damages.

56. Principal Life has no adequate remedy at law, and therefore, seeks that the Disability Policy be declared null and void and rescinded, *ab initio*.

57. In the alternative, Principal Life has no adequate remedy at law, and therefore seeks that the terms and provisions of the Disability Policy pertaining to the conditions precedent to the effectiveness of coverage be specifically enforced.

**WHEREFORE**, Principal Life demands judgment against Graham for relief more particularly described as follows:

(a) an order specifically enforcing the conditions precedent to the effectiveness of coverage under and pursuant to the Disability Policy bearing policy no. 7869202; and

(b) an order declaring and adjudging that the Disability Policy was and is not effective given the material change in Graham's insurability from that represented and stated in the Application thereby rendering the Disability Policy bearing policy no. 7869202 null and void and of no force and effect; and

(c) an order declaring and adjudging the Disability Policy bearing policy no. 7869202 to be null and void and rescinded, *ab initio*; and

(d) an order awarding pre-judgment interest, post-judgment interest, costs of suit, reasonable attorney fees and such other relief as the Court deems equitable and just.

Dated: September 6, 2016

McELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
Attorneys for Plaintiff,
Principal Life Insurance Company

By: _____
Steven P. Del Mauro, Esq.

*3166194*